STATE OF NORTH CAROLINA v. WILLIE BROWN, JR.

No. 565A83

(Filed 10 December 1985)

### 1. Criminal Law § 22— murder—no arraignment—no error

The trial court did not err by trying defendant for first degree murder without first conducting a formal arraignment because the failure to conduct an arraignment on a capital charge does not constitute reversible error *per se*, because defendant was not prejudiced in that the record was replete with pretrial motions, letters, and orders listing the charges against defendant, and because defendant was tried as if he had pled not guilty. N.C.G.S. 15A-941.

### 2. Searches and Seizures § 7— murder and robbery—evidence seized and statements made after arrest—probable cause to arrest—evidence and statements admissible

Physical evidence seized from defendant and pretrial statements made by defendant after his arrest for murder and robbery were admissible where officers had probable cause to arrest in that the arresting officer had personal knowledge of the disappearance of a Zip Mart clerk, her car, and the store's money; the officer observed the clerk's car being driven in a suspicious manner in an area near the Zip Mart soon after the disappearance was reported and at an hour when the streets were largely deserted; and defendant attempted to evade apprehension when he discovered that he was being followed by police.

### 3. Constitutional Law § 67; Jury § 7.11— death qualified jury—no error

The practice of death qualifying the jury did not deprive defendant of a fair trial.

### 4. Jury § 7.12— juror excluded for opposition to capital punishment—no violation of Witherspoon standard

In a prosecution for robbery and murder, the trial court did not err by excluding a juror who explicitly stated that he could not vote to return a sentence of death under any circumstances. *Witherspoon v. Illinois*, 391 U.S. 510, did not set out any specific terminology or ritualistic form of questioning which must be employed when delving into a juror's views on capital punishment.

### 5. Jury § 6— murder and robbery—motion for sequestration and individual voir dire denied—no error

The trial court did not err in a prosecution for murder and robbery by denying defendant's motion for sequestration and individual *voir dire* of prospective jurors where the dismissed juror to whom defendant pointed in support of the contention that a collective *voir dire* permitted prospective jurors to become educated as to responses which would enable them to be excused from the panel was the first juror to be excused on the basis of his opposition to the death penalty. Moreover, the statement by the juror that he may not have been opposed to the death penalty the day before, but was that day, indicated merely that he had been forced for the first time to take a position on capital punishment. N.C.G.S. 15A-1214(j).

**6. Jury § 6.4— murder and robbery—voir dire question—whether potential jurors thought death penalty would be enforced—objection sustained—no error**

    The trial court did not err in a prosecution for murder and robbery by sustaining the State's objection to defendant asking a potential juror whether there was anything to make him believe that a death sentence would not be carried out. Defendant failed to show that jurors who have doubts as to whether the State would actually carry out an execution would be inclined to give less than their full and serious consideration to the decision of whether to return a sentence of death; moreover, the juror in this case had been asked and had answered an almost identical question.

**7. Criminal Law § 101— bailiff sitting next to prosecutor—no prejudice**

    In a prosecution for murder and robbery in Martin County in which the jury was brought from Perquimans County, the trial court properly denied defendant's motion for a mistrial where the sheriff of Perquimans County, who was acting as bailiff, seated himself directly behind or adjacent to the prosecutor when the jury selection began; defense counsel objected and moved for a mistrial; the trial judge gave defense counsel the alternatives of allowing the sheriff to remain seated next to the prosecutor and having a deputy carry out the jury functions, or of requiring the sheriff to move and having him continue to assist in providing transportation and lunch for the jurors; and defendant chose the latter alternative. There was no substantial and irreparable prejudice to the defendant because the conduct in question occurred on the first day of jury selection, defendant objected within a matter of minutes, the trial judge took immediate steps to correct the situation, the sheriff engaged in no communications with the jury during the short interval between the time he sat down and when the objection was lodged, and there was no allegation that the sheriff made improper extrajudicial comments to any of the jurors.

**8. Homicide § 18.1— murder—evidence of premeditation sufficient**

    The trial court did not err by submitting to the jury the charge of first degree murder based on premeditation and deliberation where there was evidence that the Zip Mart where the victim worked had been robbed; defendant was in possession when arrested of the victim's car and personal effects, a sum of money consistent with the amount estimated to have been taken from the store, and the murder weapon; the victim's body was discovered on an isolated dirt road several miles from the store; and the physical evidence tended to show that defendant shot the deceased six times and that some of the shots were fired while the victim was lying on the ground.

**9. Constitutional Law § 80— death penalty constitutional**

    The North Carolina death penalty statute is constitutional. N.C.G.S. 15A-2000 *et seq.*

**10. Criminal Law § 135.6— sentencing for murder—prior convictions involving violence stipulated—State allowed to present evidence during sentencing phase—no error**

    The trial court did not err during the sentencing phase of a prosecution for murder by allowing the State to present evidence of the circumstances surrounding his prior convictions for offenses occurring in Virginia even though

defendant was willing to stipulate the existence of the Virginia convictions and that they all involved the use or threat of violence. The prosecution must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty so as to avoid an arbitrary or erratic imposition of the death penalty.

**11. Criminal Law § 135.9— murder—mitigating factors submitted over defendant's objection—no error**

The trial court did not err in a prosecution for murder by submitting to the jury the mitigating factor of no significant history of prior criminal activity over defendant's objection. It was apparent that the trial judge felt that it was in defendant's favor for the jury to consider the significance of his convictions in 1963 and 1965 in light of circumstances and events which followed. Defendant was only 20 years old when convicted of the 1965 offenses, defense counsel argued strenuously that there was no evidence that defendant committed any violent acts or violated any prison rules during the 18 years that he was incarcerated, and defendant presented nothing to support his claim that the submission of this factor poisoned the minds of the jurors against finding any other mitigating circumstances. N.C.G.S. 15A-2000(f)(1).

**12. Criminal Law § 135.9— murder—rebuttal of mitigating factor—State allowed to present evidence of prior convictions in case in chief—no prejudice**

There was no prejudice in the sentencing phase of a prosecution for murder where the State was allowed to present evidence during its case in chief of defendant's six convictions for felonious breaking and entering and felonious larceny. It was clear from the instructions that the evidence was not admitted to establish the aggravating factor of prior convictions of a felony involving the use or threat of violence, as defendant contended, but to rebut the mitigating factor of no significant history of prior criminal activity. Although the introduction of this evidence was premature, there was no prejudice because it was merely the timing of the evidence which was erroneous, and because defendant had acknowledged convictions for breaking and entering, armed robbery, and assault during the guilt-innocence phase of the trial. N.C.G.S. 15A-2000(e)(3), N.C.G.S. 15A-1443(b).

**13. Criminal Law § 135.8— murder—aggravating factor—especially heinous, atrocious or cruel killing—properly submitted**

The trial court did not err during the sentencing phase of a prosecution for murder by submitting the aggravating factor that the killing was especially heinous, atrocious or cruel where the defendant robbed a convenience store; the clerk was forced to accompany defendant in her car to a secluded area approximately five miles from the store and was shot six times; there was evidence that her hands had been bound; and there was medical testimony that the victim may have lived as long as fifteen minutes after being shot, would have gone into shock during the last phase of life, and would have lost consciousness in the latter stages of shock. N.C.G.S. 15A-2000(e)(9).

State v. Brown

14. **Criminal Law § 135.7— sentencing for murder—characterization of jury's decision as recommendation—no error**

The trial court did not err in the sentencing phase of a prosecution for murder by characterizing the jury's sentencing decision as a recommendation where defense counsel emphasized to the jury in his closing argument that its decision would be binding on the trial court and the judge explicitly informed the jury during its instructions that the sentencing recommendation would be binding on the court. N.C.G.S. 15A-2002.

15. **Criminal Law § 138.29— armed robbery—perjury as aggravating factor—no error**

The trial court did not err in a prosecution for armed robbery by finding as an aggravating factor that defendant had repudiated his previously acknowledged wrongdoing while under oath and that such repudiation was wholly untrue. The Fair Sentencing Act does not preclude perjury as an aggravating factor and the evidence showed that defendant gave a limited confession to the armed robbery on the day of the crime but denied making the statement at trial and also denied an earlier shooting about which the victim testified.

16. **Criminal Law § 181— murder and robbery—post-conviction motions denied—no error**

The trial court did not err in a prosecution for murder and robbery by denying defendant's post-guilt phase motions to set aside the verdict as contrary to the evidence and to law, for a new trial, and to arrest judgment. There was no abuse of discretion, the evidence was sufficient to support the jury's verdict, defendant brought forth no meritorious claim entitling him to a new trial, and the record revealed no basis for an arrest of judgment.

17. **Criminal Law § 181— murder and robbery—post-penalty motions denied—no error**

The trial court did not err in a prosecution for murder and robbery by denying defendant's post-penalty motions to set aside the verdicts as contrary to the evidence and the law where the evidence clearly supported the existence of the aggravating factors found to exist, the finding that the aggravating factors outweighed the mitigating factors, and the finding that the aggravating factors were sufficiently substantial to call for the imposition of the death penalty.

18. **Criminal Law § 135.10— murder—death penalty—evidence supported aggravating factors—no passion or prejudice—not disproportionate**

In a prosecution for murder in which the jury recommended the death penalty, the record fully supported the submission of the aggravating factors which were found by the jury; there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and the sentence was not excessively disproportionate where defendant deliberately sought out and robbed a convenience store during the early morning hours when the lone employee was most vulnerable; defendant proceeded to rob the store, kidnap the clerk, drive her to an isolated location, and shoot her six times; the obvious motive was to prevent the clerk from

identifying defendant; and the evidence indicated that the clerk did not die immediately, but may have remained conscious for up to a quarter of an hour before death. N.C.G.S. 15A-2000(d)(2).

Justice BILLINGS did not participate in the consideration or decision of this case.

Justice EXUM dissenting as to the sentence.

Justice FRYE joins in the dissent.

BEFORE *Smith, J.,* at the 7 November 1983 Criminal Session of Superior Court, MARTIN County, defendant was convicted of first-degree murder and robbery with a dangerous weapon. Following a sentencing hearing held pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death for the murder conviction. Defendant was sentenced to a consecutive term of 40 years imprisonment for the armed robbery conviction. From the imposition of a sentence of death, defendant appeals as a matter of right. N.C.G.S. § 7A-27(a). We allowed defendant's motion to bypass the North Carolina Court of Appeals on the armed robbery conviction on 14 December 1984. Heard in the Supreme Court 5 February 1985.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Herman E. Gaskins, Jr., for defendant-appellant.*

MEYER, Justice.

Defendant brings forward numerous assignments of error relating to both the guilt-innocence phase and the sentencing phase of his trial. For the reasons stated below, we uphold his convictions for first-degree murder and for robbery with a dangerous weapon, and the sentences imposed thereon.

Defendant was charged in indictments, proper in form, with the 6 March 1983 armed robbery and murder of Vallerie Ann Roberson Dixon. The State's evidence at trial tended to show that at 5:47 a.m. on 6 March 1983, the Williamston Police Department received a call to the effect that the Zip Mart on Main Street seemed to be open for business, but the clerk was not there. Among those officers notified of the call was Officer Verlon Godard. Officer Godard made it known that he had just seen the

clerk, Vallerie Ann Dixon, in the store while patrolling the area at 5:20 a.m. Several officers, including Godard, were immediately dispatched to the store and confirmed that Dixon and her car, a 1973 brown and tan four-door Plymouth sedan owned by her mother, were missing. The officers also found Dixon's pocketbook and a small amount of change scattered on the floor near the cash register. The store's manager was summoned, and upon her arrival, she reported that approximately $90.00 was missing from the register and safe.

At this time, the police initiated a concerted effort to find Dixon and sent Patrolman Johnny Sharp to look for her vehicle. At approximately 6:20 a.m., Patrolman Sharp reported over the radio that he had spotted the car on Highway 64. The car was heading towards town at a speed of five to ten miles per hour, and a check of the license plate number confirmed that it belonged to a member of Dixon's family. Sharp then pulled up behind the Plymouth and activated his flashing blue lights and siren. In response, the driver increased his speed and drove for several blocks in an apparent attempt to evade the patrolman. However, the car rolled to a stop just as a vehicle driven by Sergeant Donnie Hardison arrived to cut it off. The officers remained by their vehicles with guns drawn and demanded that the driver immediately exit the vehicle. After a delay of 10 to 20 seconds, a man identified as the defendant got out of the car. He was immediately placed under arrest and advised of his rights.

A search of the car incident to the defendant's arrest resulted in the discovery of a .32 caliber six-shot revolver and a paper bag containing approximately $90.00 in cash and a small change purse containing money, identification, and other items belonging to Dixon. The revolver contained four live cartridges, one spent shell, and an empty cylinder. A search of the defendant's person produced a toboggan cap with eye holes cut out of it and a pair of ski gloves. The exterior of the car was examined and found to be partly covered with fresh mud.

At the police station, the defendant was again advised of his rights and questioned by local police and Special Agent Kent Inscoe of the State Bureau of Investigation. The defendant admitted that he had walked to the Zip Mart and robbed the clerk while wearing a toboggan cap and using a .32 caliber revolver. He

stated that he ordered the clerk to give him her car keys, and he proceeded to make his escape in her vehicle until being apprehended by the police. The defendant, however, denied having any knowledge of the present whereabouts of the clerk and stated that he had left her unharmed at the store.

At approximately 10:00 a.m., an automobile belonging to the defendant's mother was discovered approximately 100 yards from the Zip Mart. When confronted with this information, the defendant admitted that he did not walk from his mother's house, but that he drove the car to that point.

At approximately 4:00 p.m. that same day, searchers discovered Ms. Dixon's body in an area consistent with the location defendant was headed away from when spotted that morning. The body was discovered more than one-tenth of a mile up an unpaved and muddy single-lane logging path located within five miles of town. The fully clothed body was lying face down across some washed-out tire tracks. A purple cord was tied around one wrist. Dixon's mother, with whom she lived, could not identify the cord as belonging to her daughter.

Dr. Lawrence Harris, a forensic pathologist, performed an autopsy on the body of the victim. Dr. Harris testified that Dixon had been shot six times. Entrance wounds were found in the chin, the back side of the upper right arm, at the back base of the neck, the lower central part of the back, the right breast, and the back of her right thigh. Assuming that Dixon's upper body was in an upright position when struck by the bullets, the shot to the chin travelled on a slightly downward plane, while the remaining bullets travelled at an upward angle of approximately 30 degrees. Dr. Harris testified that the paths of the bullet wounds to the back were consistent with the wounds having been administered to the victim as she lay face down on the ground. He testified, however, that he could not be certain as to the position of the body when the shots were fired. Although he could not ascertain which bullet was fired first, Dr. Harris was able to conclude that Dixon slowly bled to death as a result of all six wounds over a period of approximately 15 minutes and would have lost consciousness shortly before she died. Dr. Harris also discovered a series of scratch marks approximately three and one-half inches long on Dixon's left forearm.

Special Agent Douglas Branch of the State Bureau of Investigation testified that he performed test firings with the gun which was discovered in the car at the time of defendant's arrest. He stated that, in his opinion, a comparison of the test-fired bullets with the bullets removed from Ms. Dixon revealed that she had been shot with that gun. Agent Branch had also examined the blouse the victim was wearing when she was shot. He testified that the fabric ends surrounding the bullet hole to the right front midsection of the blouse were melted. This indicated that the muzzle of the gun was pressed into the blouse at the time that shot was fired. Agent Branch could not accurately determine the range involved with the other shots.

The defendant took the stand and testified that he was living in Williamston with his mother on 6 March 1983. He testified that he awoke at approximately 6:00 a.m. and left the house in his mother's car in order to pick up his girlfriend and take her to work. Upon realizing that he was too early to take his girlfriend to work, the defendant stated that he parked his mother's car and began to jog. As he did so, he saw another man run past him and away from another automobile parked on Carolina Avenue. The defendant stated that the door to that car was open and that a gun and a bag full of money were visible on the front seat. He stated that he sat down in the car but before he could leave, the police arrived and arrested him. Defendant denied that he either robbed or killed Ms. Dixon and also denied making any admissions to the police. He acknowledged that he had been to the Zip Mart on prior occasions and that he knew Dixon as the sister of a former classmate.

On cross-examination, the defendant admitted that he had been convicted of breaking or entering in North Carolina and that he had been convicted of five armed robberies and an assault on a police officer in Virginia. However, he denied having actually committed any of those crimes.

Following the presentation of all the evidence, the jury found the defendant guilty of first-degree murder and of armed robbery.

At the sentencing phase of the trial, the State introduced evidence of defendant's record of prior convictions. In 1963, defendant was convicted in Martin County of six counts of felonious larceny and six counts of breaking or entering. In 1965, defendant

received an 80-year sentence in Virginia on five counts of armed robbery and one count of felonious assault. The victim of this assault, former Portsmouth, Virginia, police officer James M. Caposella, was permitted to testify regarding the details of defendant's former crimes. Mr. Caposella stated that on 5 March 1965, the defendant, in an attempt to avoid arrest, shot him three times, causing him to fall to the floor paralyzed. As the defendant ran away, he shot at the officer twice more but missed. Mr. Caposella stated that he had yet to fully recover from his injuries.

The defense presented evidence of the defendant's close relationship with his mother and of his poor scholastic record in school.

At the close of the sentencing phase of the trial, the trial court submitted three possible aggravating and seven possible mitigating circumstances for the jury's consideration. The jury found each of the aggravating factors and none of the mitigating circumstances and returned a recommendation that the defendant be sentenced to death. Following the recommendation, the trial court entered judgment sentencing the defendant to death.

I.

Guilt-Innocence Determination Phase

[1] The defendant initially contends that the trial court committed reversible error by trying defendant on a capital charge without first conducting a formal arraignment. The record is silent as to whether a formal arraignment was held, and we must therefore proceed on the assumption that no arraignment took place. We conclude, however, that this omission does not render the verdict or judgment invalid.

An arraignment is a proceeding whereby a defendant is brought into open court before a judge having jurisdiction to try the offense so that he may be formally notified of the charges pending against him and so that he may be directed to enter a plea. N.C.G.S. § 15A-941. In recent years, this Court has recognized an increasingly flexible standard in the application of arraignment procedure:

> If a defendant fails to plead after the prosecutor has read the charges or otherwise fairly summarized them, the court must

record the fact, and defendant must be tried as if he had entered a plea of not guilty. . . . Where there is no doubt that a defendant is fully aware of the charge against him, *or* is in no way prejudiced by the omission of a formal arraignment, it is not reversible error for the trial court to fail to conduct a formal arraignment proceeding.

*State v. Smith*, 300 N.C. 71, 73, 265 S.E. 2d 164, 166 (1980) (citations omitted) (emphasis added); *see generally State v. McCotter*, 288 N.C. 227, 217 S.E. 2d 525 (1975).

Defendant counters by asserting that this liberalization has not been extended to capital cases. In so doing, defendant mistakenly relies on language contained in *McCotter*. In *McCotter*, this Court quoted the following language:

Today the modern trend is that "[a]rraignment may be waived by pleading not guilty or by silence, *at least in all except capital cases*, if the accused is fully informed as to the charge and is not otherwise prejudiced in the trial of the case by the omission of that formality."

*Id.* at 233, 217 S.E. 2d at 529 (*quoting* 21 Am. Jur. 2d, *Criminal Law* § 457 (1965)). Contrary to the defendant's assertions, this statement does not set forth a rule requiring a formal arraignment in capital cases. The cited language merely suggests that arraignment may or may not be required in capital cases and that this Court need not have addressed the issue in that particular non-capital case. Moreover, since *McCotter*, this Court has faced this issue and reached a conclusion contrary to the defendant's position and consistent with the trend away from rigid application of arraignment procedure. For example, in *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982), it was argued that the alleged illegality of an arraignment invalidated the judgment and death sentence imposed. In rejecting the contention, this Court held that:

The failure to conduct a formal arraignment itself is not reversible error. *State v. Smith*, 300 N.C. 71, 265 S.E. 2d 164 (1980). The purpose of an arraignment is to allow a defendant to enter a plea and have the charges read or summarized to him and the failure to do so is not prejudicial error unless defendant objects and states that he is not properly informed

of the charges. *State v. Small,* 301 N.C. 407, 272 S.E. 2d 128 (1980).

*Id.* at 174, 293 S.E. 2d at 584. Defendant attempts to distinguish *Brown* on the grounds that the objections in that case were based on the alleged impropriety of the arraignment and not on its complete absence. The *Brown* decision, however, did not address specific allegations of illegality nor premise its ruling on those grounds. It is clear that the key inquiry is not whether the arraignment procedure was flawed or was never held, but must instead focus on whether the defendant was prejudiced thereby. We expressly reject the defendant's contention that the failure to conduct an arraignment on a capital charge constitutes reversible error *per se.*

Having rejected defendant's proposed *per se* rule, we must nevertheless determine whether he has been prejudiced under the existing standard. We conclude that he has not. The record is replete with pretrial motions, letters, and orders which are prefaced by listing the charges against him. Moreover, defendant was tried as if he had pled "not guilty." This assignment of error is overruled.

[2] The defendant next assigns as error the denial of his motion to suppress physical evidence seized from him and pretrial statements made by him on the grounds that they were obtained as a result of an illegal arrest. The defendant contends that the circumstances at the time of his arrest only justified an investigative detention by police officers. *See Terry v. Ohio,* 392 U.S. 1, 20 L.Ed. 2d 889 (1968). Relying on *Dunaway v. New York,* 442 U.S. 200, 60 L.Ed. 2d 824 (1979), defendant argues that there was no probable cause to justify his arrest and that the evidence and statements subsequently obtained must be suppressed. We disagree.

Probable cause exists if, at the time of the arrest, the arresting officer has facts and circumstances within his knowledge sufficient to warrant a prudent person in believing the suspect had committed or was committing an offense. *Beck v. Ohio,* 379 U.S. 89, 13 L.Ed. 2d 142 (1964); *State v. Rinck,* 303 N.C. 551, 280 S.E. 2d 912 (1981); *State v. Joyner,* 301 N.C. 18, 269 S.E. 2d 125 (1980). "The existence of probable cause to arrest an individual is a pragmatic question to be determined in each case in light of the

particular circumstances and the particular offense involved."
*Rinck*, 303 N.C. at 562, 280 S.E. 2d at 921.

A careful analysis of the facts and circumstances known to
the officers when they arrested the defendant clearly shows the
existence of probable cause for his arrest. The evidence reveals
that at 5:47 a.m., Officer Sharp was at the police station preparing
to go on duty when a caller reported the absence of the clerk at-
tending the Zip Mart on Main Street. Sharp went to the store
with other officers but was unable to locate Dixon or the brown
four-door Plymouth which was known to be driven by her. Both
Dixon and the vehicle were seen at the Zip Mart at approximate-
ly 5:20 a.m. by Officer Verlon Godard. The officers contacted the
manager of the store who, upon arrival, opened the cash register
and found it empty. Officer Sharp was then dispatched to tour the
vicinity and search for the Plymouth automobile. While patrolling,
he spotted Dixon's vehicle travelling at a speed of five to ten
miles per hour in a 45-mile-per-hour zone. Officer Sharp confirmed
his identification by checking the license plate number. He then
pulled behind the vehicle and activated his blue light and siren.
The driver responded by rapidly accelerating to a speed of 40 to
45 miles per hour in an apparent attempt to evade Sharp. Defend-
ant made two turns and stopped only after being cut off by a sec-
ond patrol car driven by Sergeant Hardison. Sergeant Hardison
and Officer Sharp, with weapons drawn, demanded that the
driver get out of the Plymouth. The driver continued to sit in the
car, and the officers repeated the order. Eventually, the defend-
ant exited the vehicle. The defendant was then handcuffed, and a
search of his person produced a pair of ski gloves and a toboggan
cap. A search of the vehicle's passenger compartment produced a
pistol and a brown paper bag containing, among other items, Dix-
on's driver's license and over $90.00 in cash and change.

In light of these facts and circumstances, the officers were
clearly justified in making more than an investigative detention.
Officer Sharp had personal knowledge of the disappearance of
Dixon, her car, and the store's money. He observed Dixon's car
being driven in a suspicious manner in an area near the Zip Mart
soon after the disappearance was reported and at an hour when
the streets were largely deserted. When the defendant dis-
covered that he was being followed by the police, he attempted to
evade apprehension. We hold that these facts and circumstances

were sufficient to establish probable cause to believe that the defendant had committed a crime, including but not limited to larceny of a motor vehicle. The evidence obtained as a result of the arrest was therefore admissible against the defendant. This assignment of error is overruled.

[3] The defendant next argues that the practice of "death-qualifying" the jury before the guilt-innocence phase of his trial resulted in a jury biased in favor of the prosecution on the issue of guilt and deprived him of a fair trial. We have consistently rejected such arguments. *E.g., State v. Noland,* 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied,* --- U.S. ---, 84 L.Ed. 2d 369, *reh'g denied,* --- U.S. ---, 85 L.Ed. 2d 342 (1985); *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197, *cert. denied,* --- U.S. ---, 83 L.Ed. 2d 299 (1984). This assignment of error is without merit.

[4] The defendant also argues that one of the jurors challenged for cause due to his opposition to capital punishment was improperly dismissed in violation of the standard established in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776 (1968). In *Witherspoon,* the United States Supreme Court held that jurors may not be excused for cause simply because they voiced general objection to capital punishment. The Court went on to say that jurors may be excused for cause by the prosecution if they express an unmistakable commitment to automatically vote against the death penalty, regardless of the facts and circumstances which might be presented, or if they clearly indicate that their attitudes against the death penalty would prevent them from making an impartial decision as to the defendant's guilt. The defendant contends that *Witherspoon* requires the prosecution to ask a juror if he would "consider" the death penalty and that this question was not posed to one particular juror who was excused for cause. This contention is meritless.

First, the *Witherspoon* opinion did not set out any specific terminology or ritualistic form of questioning which must be employed when delving into a juror's views on capital punishment. It merely requires that a juror *reveal* his unwillingness to consider the death penalty. *See State v. Gardner,* 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied,* --- U.S. ---, 84 L.Ed. 2d 369 (1985); *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983). Furthermore, in the recent case of *Wainwright v. Witt,* 469 U.S. ---,

State v. Brown

83 L.Ed. 2d 841 (1985), the Supreme Court clarified *Witherspoon* and held that the proper standard for determining whether a prospective juror may be excluded for cause due to views concerning the death penalty "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at ---, 83 L.Ed. 2d at 851-52 (1985) (*quoting from Adams v. Texas*, 448 U.S. 38, 45, 65 L.Ed. 2d 581, 589 (1980) ). Under this standard, it is clear that the juror in question was properly dismissed. The record clearly indicates that this juror explicitly stated that he would not vote to return a sentence of death under any circumstances.

[5] The defendant next argues that the trial court erred in denying his motion for the sequestration and individual *voir dire* of prospective jurors. He contends that as a result of the collective *voir dire*, many jurors were able to observe other jurors being excused for cause due to their opposition to the death penalty and were therefore able to frame their responses so as to achieve disqualification as well.

N.C.G.S. § 15A-1214(j) provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." This provision does not grant either party any absolute right. *See State v. Jackson,* 309 N.C. 26, 305 S.E. 2d 703 (1983). The decision whether to grant sequestration and individual *voir dire* of prospective jurors rests in the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of an abuse of discretion. *Id.; State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979). The argument that a collective *voir dire* permits prospective jurors to become "educated" as to responses which would enable them to be excused from the panel has been rejected by this Court as "speculative." *State v. Wilson,* 313 N.C. 516, 330 S.E. 2d 450 (1985); *State v. Stokes,* 308 N.C. 634, 304 S.E. 2d 184 (1984).

The defendant, however, points to the following statements made by juror Gregory:

MR. GRIFFIN: You are opposed to the death penalty?

JUROR: Yes, sir.

MR. GRIFFIN: You're telling us you are—

JUROR: I am at this point. Maybe I wasn't yesterday, but this morning I am. Definitely this morning I would not.

The defendant claims that this exchange eliminates any speculation concerning his contention that jurors became "educated" to the responses necessary to obtain dismissal from the jury panel. We disagree. Initially, the record shows that Gregory was the first juror to have been excused for cause on the basis of his opposition to the death penalty. He therefore could not have been educated by the results of any prior questioning. Furthermore, the statement by Gregory may merely reflect that for the first time, he had been forced to take a position on the issue of capital punishment. We conclude that the trial judge did not abuse his discretion in denying the defendant's motion for sequestration and individual *voir dire* of prospective jurors. This assignment of error is overruled.

[6]   The defendant's next argument centers on the following exchange which took place during the jury *voir dire*:

MR. GASKINS: Is there anything that, Mrs. Williamson, that you have read or heard about the death penalty that you—would make you believe that if you sat on this jury, and that if, in the first phase of the case, the defendant were convicted of first degree murder, and, in the second phase, that the jury sentenced him to death, is there anything that would make you believe that that sentence would not be carried out?

JUROR: I've never read anything about it.

MR. GASKINS: Well, is there anything you've heard or read that would make you think that the State of North Carolina would really not execute Willie Brown, Jr., if this jury said that he should be executed?

MR. GRIFFIN: I'm going to object to that question.

COURT: Sustained.

The defendant contends that he was attempting to ascertain whether the jurors might believe that even if they were to return a verdict recommending the death penalty, it would not be car-

ried out for reasons such as appeal, clemency, or change in the law. The defendant argues that such jurors might be less likely to give serious consideration to the decision of whether to return the death penalty against him. He therefore argues that the trial court impermissibly restricted his right to inquire into the beliefs and attitudes of the prospective jurors concerning the death penalty. We find this argument to be without merit.

It is well established that in a capital case, both the State and the defendant are entitled to inquire into a prospective juror's beliefs and attitudes regarding capital punishment so that both sides may be assured a fair trial before an impartial jury. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1983); *State v. Bell*, 287 N.C. 248, 214 S.E. 2d 53 (1975). The trial court, however, is vested with broad discretion in controlling the extent and manner of such inquiry, and its decision will not be disturbed absent a showing of an abuse of discretion. *State v. Adcock*, 310 N.C. 1, 310 S.E. 2d 587 (1983); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, --- U.S. ---, 84 L.Ed. 2d 369 (1985). We detect no such abuse of discretion here.

Initially, the defendant has failed to present any evidence or authority in support of his theory that jurors who have doubts as to whether the State would actually carry out an execution would be inclined to give less than their full and serious consideration to the decision of whether to return a sentence of death. We believe that such an argument is speculative at best. Therefore, even if a juror did not feel the State would carry out an execution, the defendant has failed to show that the inclusion of such a juror would deprive him of a fair and unbiased jury. Since the question was irrelevant to this inquiry, the trial judge did not err in sustaining the State's objection to it. Also, we note that immediately before the objected-to question was posed, the juror was asked, and in fact answered, an almost identical question. The trial judge acted well within his discretion in sustaining an objection to a question which was merely repetitious. *See State v. Satterfield*, 300 N.C. 621, 268 S.E. 2d 510 (1980) (upheld trial judge's sustaining of State's objections to repetitious questions asked during cross-examination of a witness). This assignment of error is overruled.

[7]  The defendant's next assignment of error concerns the trial court's denial of his motion for a mistrial based on an alleged im-

propriety involving the Sheriff of Perquimans County. Due to substantial prejudicial pretrial publicity in Martin County, the jury for the trial was selected from a special venire drawn from Perquimans County. The jury was to be selected in Perquimans County and then transported to Martin County for the trial. In the order directing that the jury be selected in Perquimans County, the Sheriff of Perquimans County was instructed to assist the Sheriff of Martin County in providing transportation for the jurors between Perquimans and Martin Counties and to make arrangements each day for the jurors' lunch.

On the first day of jury selection, Sheriff Broughton of Perquimans County was present in the courtroom and was acting as bailiff. When jury selection began, Sheriff Broughton seated himself "directly behind or adjacent to" the prosecutor. Early in the jury selection process, defense counsel objected to the position of Sheriff Broughton and moved for a mistrial. The motion was denied. However, the trial judge gave defense counsel the alternatives of allowing Sheriff Broughton to remain seated adjacent to the prosecutor, in which case the trial judge would designate a deputy to carry out the functions specified in the order, or requiring the Sheriff to move, in which case he would continue to carry out the duties set out in the order. Defense counsel chose the latter alternative. The defendant argues, however, that by his actions Sheriff Broughton became a "silent advocate" for the prosecution and that the alternatives afforded him by the trial court were insufficient to cure the prejudice which had occurred. We do not agree.

A mistrial is to be declared when conduct takes place inside or outside the courtroom, which results in substantial and irreparable prejudice to the defendant. *State v. Wall,* 304 N.C. 609, 286 S.E. 2d 68 (1982); N.C.G.S. § 15A-1061. The decision of whether to grant a mistrial, however, rests in the sound discretion of the trial judge, and it will not be disturbed absent a showing of an abuse of discretion. *State v. Loren,* 302 N.C. 607, 276 S.E. 2d 365 (1981); *State v. Pearce,* 296 N.C. 281, 250 S.E. 2d 640 (1979).

Although we acknowledge that neutral court officials should refrain from in-court association with the prosecution in order to avoid even the appearance of impropriety, we are unable to dis-

cern how Sheriff Broughton's conduct constitued substantial and irreparable prejudice to the defendant. The conduct in question took place on the first day of jury selection, and the defendant objected within a matter of minutes after Sheriff Broughton initially took a seat adjacent to the prosecutor. Following the objection, the trial judge took immediate steps to correct the situation. Sheriff Broughton engaged in no communications with the jury during the short interval between the time he sat down and when the objection was lodged. There is no allegation that the Sheriff made improper extrajudicial comments to any of the jurors. (*Compare with State v. Johnson*, 295 N.C. 227, 244 S.E. 2d 391 (1978), where the bailiff told the jury after it had retired to deliberate that "he was proud that the district attorney in his argument to the jury stood up for the law enforcement officers of Swain County.") In light of the early stage of the trial and the short period of time involved, Sheriff Broughton's act of sitting adjacent to the prosecutor was simply too ambiguous to constitute a statement or communication to the jury and provides no reasonable basis upon which to impugn the fairness of the trial or the integrity of the verdict.

We have held that where the custodian or officer in charge of the jury in a criminal case is a witness for the State, prejudice to the defendant is conclusively presumed and he is entitled to a new trial. *State v. Bailey*, 307 N.C. 110, 296 S.E. 2d 287 (1982); *State v. Mettrick*, 305 N.C. 383, 289 S.E. 2d 354 (1982); *State v. Macon*, 276 N.C. 466, 173 S.E. 2d 286 (1970). We have also held that prejudice is conclusively presumed where the custodian of the jury is the spouse of the prosecuting attorney. *State v. Wilson*, 314 N.C. 653, 336 S.E. 2d 76 (1985). The underlying rationale for these holdings was the belief that the conduct which took place would create a threat to the public's confidence in the integrity of our jury system. It was felt that such conduct could lead some to believe that the jury may have been improperly influenced in some manner. The conduct here does not warrant the application of a conclusive presumption of prejudice. Sheriff Broughton was not called as a witness, and there is no indication that he engaged in any extrajudicial communication to the jury other than that required by his duties as jury custodian. In short, Sheriff Broughton's conduct was not such as to lead people to be-

lieve the jury may have been improperly influenced. This assignment of error is overruled.

[8] The defendant next argues that it was error for the trial court to submit the charge of first-degree murder based on premeditation and deliberation. He contends that the evidence was insufficient to support a reasonable inference of premeditation and deliberation.

Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence must be existing and real but need not exclude every reasonable hypothesis of innocence. *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983); *State v. Jones,* 303 N.C. 500, 279 S.E. 2d 835 (1981). In considering a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and inference to be drawn therefrom. *State v. Bright,* 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980).

Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Fleming,* 296 N.C. 559, 251 S.E. 2d 430 (1979); N.C.G.S. § 14-17. Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980). Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Bush,* 307 N.C. 152, 297 S.E. 2d 563 (1982). The phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980).

Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence. *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 117, *reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). We have also held that the nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred. *State v. Bullard,* 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* 459 U.S. 1080, 74 L.Ed. 2d 642 (1982).

We conclude in the present case that there was substantial evidence that the killing was premeditated and deliberate and that it was not error to submit to the jury the question of the defendant's guilt of first-degree murder based on the theory of premeditation and deliberation. There was evidence tending to show that the Zip Mart where Dixon worked had been robbed. When arrested, the defendant was in possession of Dixon's car, personal effects belonging to Dixon, a sum of money consistent with the amount estimated to have been taken from the store, and the murder weapon. The victim's body was discovered on an isolated dirt road several miles from the store. From this evidence, the jury could reasonably infer that the defendant robbed the store, forced Dixon to accompany him in her car, and then killed her in an attempt to avoid apprehension. There was no evidence of provocation by the deceased. Further, the physical evidence tended to show that the defendant shot the deceased six times and that some of the shots may have been fired while Dixon was lying on the ground. In light of such evidence, we hold that there was sufficient evidence of premeditation and deliberation to support the defendant's conviction for first-degree murder.

## II.

## Sentencing Phase

[9] The defendant initially contends that the North Carolina death penalty statute, N.C.G.S. § 15A-2000, *et seq.*, is unconstitutional. Specifically, he argues: (1) that the statute is applied in a manner which violates the prohibition against cruel and unusual punishment contained in the Eighth Amendment which is made applicable to the states through the Fourteenth Amendment; (2) that the statute is applied discriminatorily against certain classes of defendants in violation of the Fourteenth Amendment; (3) that the statute allows the jury subjective discretion in applying the death penalty in violation of the Eighth and Fourteenth Amendments; (4) that the provision establishing proportionality review fails to set out clear standards and guidelines for the Supreme Court to follow and thus deprives a defendant sentenced to death of an effective or adequate review of his sentence in violation of his Fourteenth Amendment right to due process; and (5) that the provision establishing proportionality review by the Supreme Court constitutes an unconstitutional expansion of the Court's jurisdiction.

The contentions raised by the defendant have been previously considered by the Court and have been decided adversely to him. *See State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, --- U.S. ---, 83 L.Ed. 2d 299 (1984) (statute not unconstitutional on grounds that it permits subjective discretion and discrimination in imposing the death penalty); *State v. Williams*, 304 N.C. 394, 284 S.E. 2d 437 (1981), *cert. denied*, 456 U.S. 932, 72 L.Ed. 2d 450 (1982) (proportionality review provision is not unconstitutional on the grounds that it fails to provide adequate guidelines and standards or that it constitutes an impermissible expansion of the Supreme Court's jurisdiction); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983) (death penalty for first-degree murder does not constitute cruel and unusual punishment). The defendant, nevertheless, urges the Court to reconsider our prior holdings and find that the death penalty statute as applied to this case is unconstitutional. The defendant, however, has presented no reasons for the Court to

depart from its prior decisions on these issues, and we decline to do so. This assignment of error is overruled.

[10] The defendant next argues that the trial court erred by allowing the State to present evidence of the circumstances surrounding his prior convictions for offenses occurring in the State of Virginia. The objected-to evidence consisted of the testimony of several witnesses who had first-hand knowledge of these prior crimes. Among these witnesses was James M. Caposella, a former Portsmouth, Virginia, policeman. Caposella testified that while responding to a 1965 robbery call, the defendant shot at him several times and inflicted a serious debilitating injury. This evidence was offered to establish the aggravating circumstance set out in N.C.G.S. § 15A-2000(e)(3), that the defendant had been previously convicted of a felony involving the use or threat of violence to the person. The defendant contends that because he was willing to stipulate to the existence of the Virginia convictions and that they all involved the use or threat of violence to the person, the State should be precluded from introducing extrinsic evidence of the circumstances surrounding the convictions. This assignment of error is meritless.

We have held that the prosecution may establish the involvement of the use or threat of violence to the person in the commission of a prior felony by the testimony of witnesses notwithstanding the defendant's stipulation of the record of conviction. *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). The defendant contends that these holdings are not controlling because he was prepared to stipulate not just to the existence of the convictions, but also to the fact that each involved the use or threat of violence. We find this distinction to be of no significance. As we stated in *McDougall,* the prosecution must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty so as to avoid an arbitrary or erratic imposition of the death penalty. Based on the sound reasonings set forth in *McDougall,* we overrule this assignment of error.

[11]   The defendant next argues that the trial court committed prejudicial error by submitting to the jury, over his objection, the mitigating factor contained in N.C.G.S. § 15A-2000(f)(1), that the defendant has no significant history of prior criminal activity. The defendant contends that in view of the evidence before the jury concerning his criminal record (convictions on six counts of felony breaking or entering, six counts of felonious larceny, five counts of armed robbery, and one count of felonious assault), it would strain credibility to believe that a jury would find the existence of this factor, and its submission merely served to denigrate in the minds of the jurors the remaining mitigating factors which were submitted. We disagree.

Initially, we note that the jury's consideration of any factor relevant to the circumstances of the crime or the character of the defendant may not be restricted. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). The trial court has a fundamental duty to declare and explain the law arising from the evidence. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We have also recognized that common sense, fundamental fairness, and judicial economy require that any reasonable doubt regarding the submission of a statutory or requested mitigating factor be resolved in favor of the defendant. *Id.*

With these principles in mind, we cannot say that the trial court erred by submitting this mitigating factor to the jury for consideration. It is apparent that the trial judge felt that, despite the objection of counsel, it was in the defendant's favor for the jury to consider the significance of the defendant's record of convictions in 1963 and 1965 in light of the circumstances and events which followed. Indeed, during the sentencing phase jury argument, defense counsel strenuously argued that there was no evidence that the defendant had committed any violent acts or violated any prison rules during the 18 years that he was incarcerated following the 1965 convictions. There was also evidence that the defendant was only 20 years old when convicted of the 1965 offenses. Although somewhat tenuous, in view of the peculiar facts presented we cannot say that the trial judge erred in submitting this mitigating factor. Moreover, even assuming the mitigating circumstance was erroneously submitted, the defendant's argument that he was prejudiced thereby is the height of

speculation. The defendant has presented nothing to support his claim that the submission of the factor, if erroneous, would have poisoned the minds of the jurors against finding any of the other mitigating circumstances submitted. This assignment of error is overruled.

[12] The defendant next argues that the trial court erred by allowing the State during its case in chief at the sentencing hearing to present evidence of his 1963 convictions on six counts of felonious breaking or entering and six counts of felonious larceny. He contends that the evidence was introduced in order to establish the aggravating factor set out in N.C.G.S. § 15A-2000 (e)(3), that he had been previously convicted of a felony involving the use or threat of violence to the person. He argues that the convictions were inadmissible for this purpose because neither felonious breaking or entering nor felonious larceny have as an element the involvement of the use or threat of violence to the person, and no evidence was presented that he actually engaged in or threatened violence in order to perpetrate the offenses. *See State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 173 (1983).

The defendant is correct in his assertion that the convictions were inadmissible to establish this aggravating factor. However, after a close examination of the record, we conclude that the convictions were not admitted for that purpose. Instead, it is apparent that the convictions were admitted to rebut the mitigating factor that the defendant had no significant history of prior criminal activity.

We derive this conclusion from an examination of the instructions given the jury at the close of the penalty phase of the trial. In discussing the aggravating factor that the defendant had been previously convicted of a felony involving the use or threat of violence, the trial judge instructed the jury that it could find this aggravating circumstance if it found the defendant had been previously convicted of robbery or the malicious shooting of Officer Caposella. No reference was made to the breaking or entering or the larceny convictions. However, when instructing the jury on the mitigating circumstance that the defendant had no significant history of prior criminal activity, the trial judge stated: "Now you would find the mitigating circumstance if you

found that Willie Brown, Jr. had *no prior criminal convictions,* or that he had been convicted of *breaking or entering, or larceny,* or assault or robbery, and that this was not a significant history of prior criminal activity." (Emphasis added.) It is obvious that evidence of the breaking or entering and the larceny convictions were admitted to rebut the mitigating factor that the defendant had no significant history of prior criminal activity and was not introduced in support of any aggravating factor.

However, as noted above, the State presented the evidence of these convictions during its case in chief at the sentencing hearing. In *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983), we said that the prosecution is entitled to offer evidence designed to rebut mitigating circumstances only after the defendant offers evidence in support of such mitigating factors. We went on to hold in *Taylor* that the premature admission of evidence offered by the State solely to refute mitigating circumstances upon which a defendant might later rely was error (although in that case the error was found not to be prejudicial). Here, the defendant did not present evidence in support of the mitigating factor that he had no significant history of prior criminal activity. Rather, the trial judge *sua sponte* instructed the jury on this mitigating circumstance. The defendant therefore presented no evidence on this issue for the State to rebut. Nevertheless, since the evidence was still technically rebuttal evidence, we feel the State should have waited until the defendant had presented his evidence at the sentencing hearing before introducing these convictions into evidence.

Having concluded that the trial court committed error by allowing the State to introduce this evidence "out of turn," our next task is to discern whether the error was prejudicial. We conclude that it was not.

In *Taylor,* we applied the standard set out in N.C.G.S. § 15A-1443(b) to determine whether prejudice occurred. Under that standard, the error is deemed prejudicial unless the State shows that the error was harmless beyond a reasonable doubt. We find that the State has clearly satisfied this standard. Initially, it should be pointed out that evidence of the convictions was proper evidence in rebuttal of the mitigating factor that the

defendant had no significant history of prior criminal activity. The timing of its admission was what constituted error. Also, the defendant acknowledged during cross-examination at the guilt-innocence phase of the trial that he had been convicted of breaking or entering (although he did not specify the number of counts nor did he acknowledge any convictions for felonious larceny), and he admitted the Virginia convictions for armed robbery and assault. The jury therefore had before it a clear record of the defendant's prior criminal activities. *See State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). We conclude that the error was harmless beyond a reasonable doubt. This assignment of error is overruled.

[13] The defendant's next assignment of error concerns the submission for consideration by the jury of the aggravating circumstance that the killing was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). He contends that the evidence did not support the existence of this aggravating factor and that he is therefore entitled to a new sentencing hearing. We do not agree.

Although every murder may be characterized as heinous, atrocious, and cruel, this aggravating factor is not to be applied in every first-degree murder case. The legislature specifically provided that this aggravating circumstance may be found only in cases in which the first-degree murder committed was *especially* heinous, *especially* atrocious, or *especially* cruel. N.C.G.S. § 15A-2000(e)(9). Therefore, a finding that this aggravating circumstance exists is permissible when the level of brutality involved exceeds that normally present in first-degree murder, *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979), or when the first-degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We have also stated that this factor is appropriate when the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder. *State v. Stanley,* 310 N.C. 332, 312 S.E. 2d 393 (1984).

In *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983), we identified two types of murder as included in the category of

murders which would warrant the submission of the especially heinous, atrocious, or cruel aggravating circumstance to the jury. One type involved killings which are physically agonizing for the victim or which were in some other way dehumanizing. The other type consists of those killings which are less violent, but involve the infliction of psychological torture, placing the victim in agony in his last moments, aware of, but helpless to prevent, impending death.

In determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was "especially heinous, atrocious, or cruel," the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984).

With the above principles in mind, we find that the evidence in this case was sufficient to support the submission of this aggravating factor to the jury.

The evidence presented tends to show that on the morning of 6 March 1983, the defendant robbed the Zip Mart convenience store in Williamston, North Carolina. He proceeded to force the clerk, Vallerie Dixon, to accompany him in her car. She was taken to a secluded area approximately five miles from the store and shot six times. There was also evidence to indicate that her hands had been bound. Dr. Lawrence Harris, who conducted an autopsy on the body, testified that, in his opinion, the principal cause of death was a gunshot wound to the right central lower back. He stated that the victim may have lived as long as 15 minutes after being shot. He went on to say that the victim would have gone into shock during the last phases of life and would have lost consciousness in the later stages of shock.

The defendant argues that there is no evidence as to what transpired after he left the Zip Mart with the decedent and that this precludes the finding of this aggravating factor. He cites *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983), in support of this assertion. In *Jackson*, the evidence showed that the defendant went for a ride with the decedent. Later, the defendant appeared and told friends that he had killed the decedent when he refused to give him any money. The decedent's body was later

discovered in his car. He had been shot twice in the head at close range with a .22 caliber weapon. We vacated the defendant's death sentence on the ground that it was disproportionate based in part on a lack of evidence of what occurred after the defendant left with the decedent. We noted that while the crime was heinous, there was no evidence to indicate that it was "especially heinous." *Id.* at 46, 305 S.E. 2d at 717.

In *Jackson*, there was simply no evidence to indicate that the victim suffered great physical pain or psychological terror prior to his murder. The same is not true in the present case. As noted earlier, the evidence would tend to show that Dixon was forced at gunpoint to leave the store with the defendant. He proceeded to drive several miles to an isolated dirt road. Clearly, Dixon was aware that she was in great danger at the time the defendant forced her to leave the store. Her anxiety undoubtedly increased as the defendant drove away from town and arrived at the secluded dirt road. We feel the evidence supports a finding that the victim was subjected to a prolonged period of terror and anguish from the time they left the store until they stopped and she was shot six times. Furthermore, Dr. Harris testified that Dixon may have lived for as long as 15 minutes after being shot and would not have lost consciousness until the final stages of life. From this testimony, it could be found that Dixon lay mortally wounded for several minutes, "aware but helpless to prevent impending death." *State v. Oliver*, 309 N.C. 326, 346, 307 S.E. 2d 304, 318 (1983).

Dr. Harris' testimony that although shot six times, Dixon may have lived for as long as 15 minutes and would not have lost consciousness until the final stages of life, would also support a finding that she suffered great physical pain prior to death.

We hold that the evidence justified the submission of the aggravating factor that the murder was especially heinous, atrocious, or cruel. This assignment of error is overruled.

[14] The defendant next argues that the trial court erred, both in the jury instructions and on the verdict form, by repeatedly characterizing the jury's sentencing decision as a "recommendation." He contends that the use of this word is misleading in that it suggests to the jurors that they are serving in merely an advisory capacity regarding sentencing, when in fact their decision

is binding on the trial court under N.C.G.S. § 15A-2002. We find this argument to be without merit.

During his closing argument at the sentencing hearing, defense counsel emphasized to the jury that its decision regarding sentencing would be binding on the trial court. Additionally, during the instructions, the trial judge explicitly informed the jury that its sentencing "recommendation" would be binding on the court. In light of this, we fail to see how the jurors could have been less than fully aware of the legal effect of their decision regarding punishment. This assignment of error is overruled.

[15] The defendant next contends that the trial court erred in finding as an aggravating factor *as to the armed robbery* conviction that he "took the stand and under oath repudiated his acknowledged . . . wrongdoing . . . [and] said repudiation was wholly untrue and has been found to be so by a Jury and the Court." We hold that the trial judge did not err in finding this aggravating factor.

In *State v. Thompson*, 310 N.C. 209, 311 S.E. 2d 866 (1984), we held that the Fair Sentencing Act does not preclude the court from finding as an aggravating factor that the defendant committed perjury. We said, however, the court's finding of perjury must be supported by a preponderance of the evidence. We believe the evidence here clearly supports the court's finding of this aggravating factor. The evidence shows that the defendant gave a limited confession to the armed robbery, but not the murder, on the day of the crime. In the statement, he said that he cut two eyeholes out of a toboggan cap and pulled it over his face. However, during his testimony at trial, he denied making any statement and said that his toboggan cap did not have eyeholes cut out of it when the police seized it from him. He also denied shooting Caposella in 1965. Caposella testified that the defendant did shoot him, and his testimony was corroborated by a police officer who participated in the defendant's arrest in Virginia. We hold that this and other evidence establishes by a preponderance of the evidence that the defendant committed perjury and that consideration of this aggravating factor was appropriate in this case. This assignment of error is overruled.

We take this opportunity to reiterate our statement in *Thompson* that due to the potential dangers inherent in this par-

ticular aggravating factor (the risk of "chilling" a defendant's right to testify, that it is in some respects an unreviewable determination, etc.), trial judges should exercise extreme caution in this area and refrain from finding perjury as an aggravating factor except in the most egregious cases.

[16] The defendant next contends that the trial court erred in denying his post-guilt phase motions to set aside the verdict as being contrary to the evidence and to law, for a new trial, and to arrest judgment. The decision whether to grant or deny a motion to set aside the verdict and for a new trial is vested in the discretion of the trial judge and is not reviewable absent a showing of an abuse of that discretion. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *modified*, 429 U.S. 912, 50 L.Ed. 2d 278 (1976). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741 (1985). We detect no abuse of discretion here. The evidence was sufficient to support the jury's verdict, and the defendant has brought forth no meritorious claim entitling him to a new trial.

As for the motion to arrest judgment, such a motion is made after the verdict to prevent the entry of judgment and is based on the insufficiency of the indictment or some other fatal defect appearing on the face of the record. *State v. McNeil*, 280 N.C. 159, 185 S.E. 2d 156 (1971). An examination of the record reveals no basis for an arrest of the judgment.

[17] The defendant next asserts as error the trial court's denial of his post-penalty phase motion to set aside the verdict as being contrary to the weight of the evidence and the law. This argument is meritless. The evidence clearly supported the existence of the aggravating factors found to exist, the finding that the aggravating factors outweighed the mitigating factors, and the finding that the aggravating factors were sufficiently substantial to call for the imposition of the death penalty. Furthermore, it is well established that the trial court has no power to overturn the jury's sentencing recommendation. *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Johnson*, 298 N.C. 335, 259 S.E. 2d 752 (1979); *see* N.C.G.S. § 15A-2002. This assignment of error is overruled.

### III.

### Statutory Review of Sentence by Supreme Court

[18]   Having determined that the defendant's trial was free from prejudicial error during the guilt-innocence and sentencing phases, we now turn to duties reserved by statute to this Court in reviewing the judgment and sentence of death. Pursuant to N.C.G.S. § 15A-2000(d)(2), we must ascertain whether the record supports the jury's findings of the aggravating factors on which the sentence of death was based; whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have thoroughly examined the record, transcripts, and briefs in this case. We have also closely examined those exhibits which were forwarded to the Court. We find that the record fully supports the submission of the aggravating factors which were considered and found by the jury. We also find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We now undertake our final statutory duty of proportionality review. This task requires the Court to determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant. In conducting this review, we use the "pool" of similar cases announced in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). This "pool" consists of all cases arising since 1 June 1977 (the effective date of North Carolina's capital punishment statute) which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended the death sentence or life imprisonment or the trial court imposed a life sentence following the jury's inability to agree upon a sentencing recommendation within a reasonable period of time.

In *Williams*, we expressly rejected any approach that would utilize "mathematical or statistical models involving multiple regression analysis or other scientific techniques, currently in

State v. Brown

vogue among social scientists." *Id.* at 80, 301 S.E. 2d at 355. Instead, we said that we would "rely upon our own case reports in the 'similar cases' forming the pool" in order to carry out this review. *Id.* at 81, 301 S.E. 2d at 356.

After a careful review of the record, transcripts, other pertinent material, and other similar cases, we conclude that the defendant's sentence of death is not excessive or disproportionate. The facts tend to show that the defendant deliberately sought out and robbed a convenience store during the early morning hours when the lone employee was most vulnerable. He proceeded to rob the store, kidnap the clerk, drive her to an isolated location, and shoot her six times. The obvious motive for the killing was to prevent the clerk from identifying the defendant as the perpetrator of the robbery. The evidence would indicate that the victim did not die immediately, but may have remained conscious for up to a quarter of an hour before death. This was a senseless and brutal murder—the robbery had been completed—its sole purpose was witness elimination. We cannot say that it does not fall within the class of first-degree murders in which we have previously upheld the death penalty. *See State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, --- U.S. ---, 84 L.Ed. 2d 369 (1985); *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, --- U.S. ---, 86 L.Ed. 2d 267 (1985); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1389, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). We are satisfied that the facts of this case fully support the jury's decision to recommend a sentence of death.

No error.

Justice BILLINGS did not participate in the consideration or decision of this case.

State v. Brown

Justice EXUM dissenting as to sentence.

I concur in the result reached by the majority on the guilt phase of this case; but believing there was error committed in the sentencing phase entitling defendant to a new sentencing hearing, I dissent from the majority's conclusion to the contrary and vote for a new sentencing hearing.

The majority finds no error in submitting the mitigating factor that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1), even though defendant did not contend he was entitled to have this factor submitted and, indeed, expressly objected to its submission. The majority concludes the trial judge has a duty to submit any statutory mitigating factor notwithstanding defendant's objection whenever the trial judge "feels" such submission may be "in the defendant's favor." It reaches this conclusion by relying on this statement from *State v. Pinch*, 306 N.C. 1, 27, 292 S.E. 2d 203, 223 (1982), *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982):

> Moreover, we must also point out that common sense, fundamental fairness and judicial economy dictate that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor to ensure the accomplishment of complete justice at the *first* sentencing hearing.

The majority takes the statement out of context. The statement was immediately preceded by the following language:

> This Court has previously established instructive guidelines for the trial judges of our State to follow in the submission of mitigating circumstances, including those which arise upon the evidence in a given capital case as well as those specified in G.S. 15A-2000(f). First, in *State v. Goodman*, we held that, although the jury's consideration of any factor relevant to the circumstances of the crime or the character of the defendant may not be restricted, the trial court 'is not required to sift through the evidence and search out every possible circumstance which the jury might find to have mitigating value,' especially when the trial court instructs the jury upon the open-ended provision of G.S. 15A-2000(f)(9) and thus does not hinder it from evaluating on

its own *anything* of mitigating value. 298 N.C. 1, 33-34, 257 S.E. 569, 589-90 (1979). Second, in *State v. Johnson*, we held that the trial court must include additional factors, which are timely requested by the defendant, on the written list submitted to the jury *if* they are 'supported by the evidence, and . . . are such that the jury could *reasonably* deem them to have mitigating value. . . .' 298 N.C. 47, 72-74, 257 S.E. 2d 597, 616-17 (1979) (emphasis added). Third, in *State v. Hutchins*, we held that, although the trial court has a fundamental duty to declare and explain the law arising upon the evidence, it is not required to instruct upon a *statutory* mitigating circumstance *sua sponte* unless defendant, who has the burden of persuasion, brings forward sufficient evidence of the existence of the specified factor. 303 N.C. 321, 355-56, 279 S.E. 788, 809 (1981); *see State v. Taylor*, 304 N.C. 249, 277, 283 S.E. 2d 761, 779 (1981).

*Id.* at 26-27, 292 S.E. 2d at 223.

It is clear that the statement in *Pinch* relied on by the majority was made with reference to mitigating circumstances which defendant contended should be submitted, not mitigating circumstances for which defendant concedes there is no supporting evidence.

It is error for the trial court to submit a mitigating circumstance when the circumstance is not supported by the evidence. There is no evidence in this case to support submission of the no significant criminal history mitigating factor. Defendant had had prior convictions of six felonious breakings, six felonious larcenies, five armed robberies, and one felonious assault. He had served a lengthy prison term.

Obviously, defendant did not want the no significant criminal history mitigating circumstance submitted because he realized that to submit it would enable the state to introduce evidence of his prior convictions which did not involve violence to another person. The state would not have been permitted to offer evidence of these convictions at the sentencing hearing but for the submission of the no significant criminal history mitigating circumstance. The majority so concedes, saying:

> The defendant is correct in his assertion that the convictions were inadmissible to establish [that defendant had been

convicted of a felony involving violence to another, N.C.G.S. § 15A-2000(e)(3)]. However, after a close examination of the record, we conclude that the convictions were not admitted for that purpose. Instead, it is apparent that the convictions were admitted to rebut the mitigating factor that the defendant had no significant history of prior criminal activity.

As noted by the majority, an error in the sentencing phase of a capital case is reversible unless the state demonstrates the error was harmless beyond a reasonable doubt. I cannot say submission of the no significant criminal history mitigating circumstance was harmless beyond a reasonable doubt because it permitted the state to offer otherwise inadmissible evidence detailing defendant's prior convictions for nonviolent crimes. The majority recognizes that defendant legitimately objected to the submission of the no significant criminal history circumstance so as to keep out evidence of his conviction of nonviolent crimes. Yet the majority holds it was not error to submit the circumstance over defendant's objection and to offer evidence of the otherwise inadmissible nonviolent felony convictions because they were relevant to the circumstance. I cannot subscribe to this kind of judicial sleight of hand to justify sustaining a sentence of death.

*State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983), holds that it is error to permit the state to introduce evidence rebutting the no significant criminal history mitigating circumstance "when defendant never intended to rely on that mitigating circumstance." In *Taylor* the Court found the error harmless beyond a reasonable doubt because much of the state's evidence "also was competent as evidence of aggravating circumstances," 304 N.C. at 277, 283 S.E. 2d at 779, and when considered with evidence at the guilt phase, the jury already had before it "a clear record of what must be described as this defendant's unconscionable acts toward so many of his victims." 304 N.C. at 278, 283 S.E. 2d at 779. This is not the case here. The evidence of which defendant here complains is evidence of a number of serious but nonviolent felonies. Furthermore, I would not agree that because evidence of prior convictions was admitted in the guilt phase on cross-examination of a testifying defendant, permitting the jury to consider the same evidence at the sentencing phase on the question of defendant's sentence is

rendered harmless beyond a reasonable doubt. During the guilt phase such evidence was admitted for the limited purpose of impeaching defendant's credibility. This does not justify permitting the jury to consider this evidence on the question of defendant's sentence. The jury may not so consider it unless authorized to do so by the capital sentencing statute, N.C.G.S. § 15A-2000. As I have demonstrated, this statute did not authorize consideration in this case of defendant's prior nonviolent felony convictions on the question of his sentence.

I also think it was error to permit testimony which, in effect, re-tried defendant for an earlier felonious assault committed in Virginia on James Caposella. Defendant had been tried, convicted and punished for this crime in Virginia. He stipulated that he had been convicted of this felonious assault and that it was a crime which involved violence to the person. Upon this stipulation the state was entitled to have the aggravating circumstance that defendant had been previously convicted of a felony involving violence to the person, N.C.G.S. § 15A-2000(e)(3), answered in its favor.

The statute permits the state to establish the existence of such a *conviction*, nothing more. The purpose of this aggravating circumstance is to show the sentencing jury defendant's *status* as one previously convicted of a violent crime. That one previously convicted of a violent crime again commits a violent crime means, in essence, that the person has not yet learned the lesson the law desires to teach. That person properly may be sentenced more severely the second time. This, however, is the only sense in which the prior offense may be considered as bearing on the punishment for the second offense. The statute does not permit the state to offer evidence of the details of the prior crime. Those details were offered and taken into consideration when defendant was tried, convicted, and punished for that crime. The statute permits the capital sentencing jury to know only that defendant has been previously convicted of a crime involving violence to another person. The reason for the limitation is to preclude the possibility that the capital sentencing jury will, upon hearing the details of the prior crime, become so incensed by its gravity that it will impose the death penalty as punishment not only for the capital crime under consideration but also for the prior violent of-

fense. This is not and cannot constitutionally be the purpose of the prior violent offense aggravating factor.

While I concur in the result reached by the majority that it was proper to submit the especially heinous aggravating circumstance, I do not agree that there is evidence supporting those facts which the majority uses to distinguish this case from *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). There is no evidence as to when, where, or under what circumstances the victim was shot or that she suffered before the shooting, as the majority says, "a prolonged period of terror and anguish . . . ." There is, however, evidence that the victim bled to death and could have lived and remained conscious for as long as fifteen minutes after the fatal wounds were inflicted. I think this fact, in itself, is enough to distinguish this case from *Jackson* and would support the submission of the especially heinous aggravating circumstance.

Justice FRYE joins in this dissent.